UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHAEL BROCKMAN,<br>    *Plaintiff*,<br><br>        v.<br><br>NAES CORPORATION,<br>    *Defendant*. | No. 3:19-cv-00006 (JAM) |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Michael Brockman worked for defendant NAES Corporation ("NAES") at a waste processing facility in Hartford, Connecticut. He principally claims that his supervisor at NAES subjected him to a racially hostile work environment by means of referring to Brockman in racially coded terms as well as by means of targeting Brockman for abusive conduct for race-based reasons.

NAES has now moved for summary judgment. Because I conclude that there are genuine issues of material facts that remain for all of Brockman's claims, I will deny the motion.

### BACKGROUND

The following facts are taken from the parties' Local Rule 56(a) statements and supporting documents. The facts are presented in the light most favorable to Brockman as the non-moving party.

Brockman is an African American man who was employed as a full-time loader operator by NAES at one of their waste processing facilities in Hartford for about nine months from September 2017 to June 2018. Doc. #83 at 1-2 (¶¶ 1, 6). His responsibilities included loading ash from the trash incinerator into dump trucks to be removed from the plant and maintaining the

1

cleanliness of the plant. *Id.* at 2 (¶ 6). Brockman's immediate supervisor was a Caucasian man named Brendan O'Connor. *Ibid.* (¶ 5).

In September 2017, shortly after Brockman began working at NAES, O'Connor gave Brockman a tour of the facility. *Id.* at 4 (¶ 13). According to Brockman, during the tour O'Connor pointed to a confined space and told Brockman, "I bet you'd go in there if there was fried chicken and watermelon inside." *Ibid.* (¶ 13).

Brockman alleges that after this initial comment, O'Connor made at least three other derogatory racial comments. First, while discussing a co-worker's child who was born out of wedlock, O'Connor told Brockman, "you know what that is, you have baby mamas." *Id.* at 5-6, 14 (¶¶ 19, 51). Second, after observing Brockman with two cell phones, O'Connor asked Brockman, "The only people I know who have two phones are drug dealers, are you a drug dealer?" *Id.* at 12 (¶ 44). Third, O'Connor also told Brockman that people in Florida "wouldn't like your kind." *Id.* at 10-11 (¶ 36).

Brockman also alleges that O'Connor threatened his job on multiple occasions. Brockman took several days of sick leave in October 2017 and January 2018. *Id.* at 23 (¶ 1). When Brockman returned to work in January 2018, O'Connor called Brockman into his office and said that he would "hold those absences against [Brockman] personally." *Ibid.* (¶ 2). Several days later, Brockman reported the threat to Ruth Romel, the human resource manager. *Ibid.* (¶ 3). Shortly thereafter, O'Connor threatened to fire Brockman, ostensibly for using his cell phone at work, and he yelled at Brockman in public "[i]f you're on the—excuse my language—fucking phone, that definitely makes you lose your job!" *Ibid.* (¶ 4). According to Brockman, he was looking at his phone to check the time for his load sheets. *Ibid.* (¶ 5).

On March 3, 2018, Brockman sought advice from his shift supervisor, Elvin Ramos, about how to deal with O'Connor. *Ibid.* (¶ 6). On Brockman's way to Ramos's office the next day for a follow up meeting, O'Connor approached Brockman and said, "you just don't get it, do you? This is not going to go well for you." *Id.* at 24 (¶ 9).

On advice from Ramos, Brockman submitted a written complaint on or about March 4, 2018 alleging harassment and discriminatory behavior by O'Connor. *Id.* at 4 (¶ 13). In the complaint, Brockman alleged that O'Connor had made "a racial comment…about black people eating chicken and watermelon" that Brockman found offensive. Doc. #83-7 at 2. Brockman also alleged that after he returned to work from sick leave, O'Connor called Brockman into his office and told him that he "can't call out" and O'Connor would "personally hold [the absences] against" Brockman. *Ibid.* Brockman described how O'Connor "curs[ed]" at him and threatened to fire him because Brockman looked at his cell phone to check the time. *Ibid.* Brockman further alleged that O'Connor told him that he could not apply for another position unless Brockman found a replacement. *Ibid.* Brockman wrote that "[t]he racial comments and threats…are unwarranted and it has been getting progressively worse in the last 2 months." *Ibid.*

Romel and plant manager John O'Rourke opened an investigation the next day. Doc. #83 at 4 (¶¶ 14-15). During the course of the investigation, O'Rourke and Romel met with Brockman, O'Connor, and other potential witnesses. Doc. #83-11 at 2. O'Connor denied that he made the chicken and watermelon comment, the comment about having two cell phones or drug dealers, the comment about "your kind" in Florida, and the comment suggesting that Brockman had "baby mamas." Doc. #74-1 at 121-122, 125-126. On March 7, 2018, O'Rourke and Romel advised Brockman that they had concluded that Brockman's complaint was "unfounded." Doc. #83 at 5 (¶ 15).

Not content with the result of the investigation, Brockman promptly called NAES's corporate ethics hotline. *Id.* at 5-6 (¶¶ 18-19), 25 (¶ 15). In the phone call he described three alleged incidents of harassment: the fried chicken and watermelon comment, the baby mamas comment, and O'Connor's excessive use of profanity. *Id.* at 5-6 (¶¶ 18-19). Brockman alleged on the hotline that O'Connor's comments were based on racial stereotypes. *Id.* at 5 (¶ 18).

Following the investigation, O'Rourke and Romel "coached" O'Connor on his management style. Doc. #83-11 at 2. They informed O'Connor that "should any of the discriminatory innuendos be true" he should stop immediately. *Ibid.* They also advised him that he could not engage in retaliatory behavior against Brockman, and they told him he should apologize to Brockman for yelling, using profanity, and reprimanding him in public. *Ibid.*

On March 9, 2018, O'Connor apologized to Brockman for using profanity. Doc. #83 at 5-6 (¶ 15). O'Connor told Brockman that he did not realize that anything he had said would have been considered offensive. *Id.* at 6 (¶ 16). He also said that he did not want Brockman to feel intimidated. *Ibid.*

On the same day as O'Connor's apology, Brockman discovered that a green swastika had been spray painted on the wall of an enclosed area in the plant where he and another African American employee worked and frequently took breaks. *Id.* at 25 (¶ 17). Earlier in the day, Brockman claims he saw O'Connor with green spray paint in that area. *Ibid.* (¶ 19). Brockman called the hotline again and alleged that O'Connor had painted the swastika, explaining that the swastika had been spray painted after O'Connor apologized to him. Doc. #83-2 at 29. O'Connor denied knowing who painted the swastika but acknowledged that it was painted in an area where no one other than Brockman and another African American employee were known to frequently take breaks. Doc. #83-4 at 9-14.

4

On March 15, 2018, Ronald Otteni, NAES Manager of Human Resources and Employee Relations, arrived from North Carolina to investigate the allegations that Brockman had made to the hotline. Doc. #83 at 6 (¶ 20). Otteni concluded that O'Connor had used profane, unprofessional, and disrespectful language when interacting with Brockman and had been reprimanded for it. Doc. #83-13 at 4. Although O'Connor had admitted to Otteni that he sometimes used "ethnic banter" when communicating with employees, Otteni could not confirm that O'Connor had used racially insensitive comments. *Ibid.* Otteni was unable to identify who painted the swastika and concluded that the swastika did not target Brockman personally. *Ibid.*

In April 2018, Brockman applied for a loader operator position at a different NAES building because he wanted to get away from O'Connor. Doc. #83 at 7, 26 (¶¶ 23, 28). Brockman submitted the application for the new job externally rather than by way of an internal request to transfer as a current employee. Doc. #83 at 7 (¶ 23). Scott Kelly, the facility manager who eventually interviewed Brockman for the position, knew that Brockman was currently employed by NAES because he had scheduled the interview on Brockman's day off at O'Connor's request. Doc. #83-3 at 2.

On April 24, 2018, Kelly interviewed Brockman and unconditionally offered him the job, which Brockman promptly accepted. Doc. #83 at 27 (¶ 30); Doc. #83-3 at 2. The next day Kelly informed O'Rourke that Brockman had accepted the job offer. Doc. #83-3 at 2. Shortly thereafter, however, NAES operations manager Hank Green informed Brockman that the offer would be rescinded and the transfer denied because Brockman had only been in his current position for seven months, and he was therefore ineligible for a transfer. Doc. #83 at 27 (¶ 31).

Around the same time the offer was rescinded, O'Connor called Brockman. *Ibid.* (¶ 33). O'Connor told Brockman that he had handled the transfer request incorrectly and could submit a resignation letter if he wanted to leave his job. *Ibid.*

Although NAES has a policy to encourage employees who have been with the company for less than one year to seek the approval of their manager before seeking an internal job transfer, the company's policy does *not* prohibit employees with less than one year of experience from seeking transfer to another company position:

> An employee should also have spent at least twelve months in the current position before seeking a new internal opportunity. Should the time in the position be less than 12 months, it is expected the employee will discuss the opportunity with his/her manager and gain the manager's support before proceeding. NAES reserves the right to hold an employee in current position based on the needs of the business.

Doc. #83-5 at 2.

On June 8, 2018, several weeks after the transfer job offer was rescinded and after Brockman had continued to work in his former position for NAES, Brockman submitted his two-weeks notice of intent to leave. Doc. #83 at 9 (¶ 30).

Brockman filed this lawsuit against NAES on January 3, 2019. Doc. #1. He alleges claims for a racially hostile work environment and retaliation under three statutes: Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et. seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, *et seq.* He also alleges that he was constructively discharged on the basis of his race in violation of Title VII and CFEPA. NAES has moved for summary judgment on Brockman's claims in their entirety. Doc. #73.

**DISCUSSION**

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve closely contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

*Hostile work environment*

A hostile work environment claim requires proof that the workplace was permeated with discriminatory intimidation, ridicule, or insult that was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and thus to create an abusive working environment. A plaintiff must show: (1) that the plaintiff subjectively perceived the environment to be abusive; (2) that objectively the environment was actually hostile and abusive; (3) that the hostile work environment was because of the plaintiff's protected status (such as the plaintiff's race, sex, religion or membership in another protected class); and (4) that the hostile work environment is attributable to the employer. *See generally Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 101-02 (2d Cir. 2020); *Legg v. Ulster Cty.*, 979 F.3d 101, 114-15 (2d Cir. 2020).[1]

---

[1] The same standards that apply in the Title VII cases cited above also apply for a hostile work environment claim under CFEPA or § 1981. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 556 (2d Cir. 2010) (CFEPA); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) (section 1981).

Viewed in the light most favorable to Brockman, the record show that his supervisor—O'Connor—made the following comments to him during the nine months that he worked at NAES: (1) that Brockman would go inside to a small space "if there was chicken and watermelon inside;" (2) that people in Florida "wouldn't like your kind;" (3) that because Brockman carries two cell phones, Brockman might be a drug dealer; and (4) that Brockman knows about "baby mamas."[2]

A jury could reasonably (and easily) conclude that each of these comments was race-related. The Supreme Court has explained that certain words standing alone might be facially non-discriminatory or appear to be benign but nonetheless may be understood as racist code words, which may in part depend on the speaker's inflection, tone of voice, local custom, and historical usage. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (*per curiam*) (discussing supervisor's use of term "boy" to refer to African American employees). Words like those used by O'Connor may be examples of "dog-whistle racism," and "Title VII can hear racism sung in the whistle register." *Lloyd v. Holder*, 2013 WL 6667531, at *9 (S.D.N.Y. 2013) (listing words like "welfare queen," "terrorist," "thug," and "illegal alien"); *see also Hawkins v. County of Oneida*, 497 F.Supp.2d 362, 375 (N.D.N.Y. 2007) (the mocking use of "black slang" such as "yo bro" and "wassup" and references to "fried chicken" and "black guy with fat girls"); *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010) (references to "Buckwheat," "fried chicken," and "ghetto"), *abrogated on other grounds Torgerson v. City of*

---

[2] There is no merit to NAES's argument that the Florida comment may not be considered because Brockman did not allege this particular comment in his complaint to the Commission on Human Rights and Opportunities ("CHRO"). Brockman properly alleged a claim for a hostile work environment to the CHRO, and he was not required—especially as a *pro se* complainant at the time—to itemize all of the evidence he would rely on to support his claim. *See Littlejohn v. City of N.Y.*, 795 F.3d 297, 322 (2d Cir. 2015); *Golden v. Mgmt. & Training Corp.*, 319 F.Supp.3d 358, 377 (D.D.C. 2018) ("Although the exhaustion requirement requires a plaintiff to administratively exhaust each *claim*, it does not require that a plaintiff include in an administrative charge all the evidence upon which a claim is based.").

*Rochester*, 643 F.3d 1031 (8th Cir. 2011); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004) (a "reference to [the plaintiff] as a 'drug dealer' might certainly be deemed to be a code word or phrase"); *Abrasam v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001) ("even the use of 'code words' such as 'all of you' and 'one of them' could be sufficient evidence from which a jury could find an intent to discriminate").[3]

A jury could also consider the generally abusive treatment of Brockman by O'Connor through the use of curse words and threats when reprimanding Brockman, and from this it could conclude that this abusive conduct was also in part because of Brockman's race. As the Second Circuit has recently noted, "when the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

On top of all this, a jury could reasonably conclude in light of the timing and other circumstances that O'Connor was responsible for the swastika that appeared just after O'Connor was pressured to apologize to Brockman, and it could conclude (of course) that a swastika reflects deep racial bias and intimidation. *See, e.g., Little v. Nat'l Broadcasting Co., Inc.*, 210 F. Supp.2d 330, 390-91 (S.D.N.Y. 2002) ("Like the swastika, the Klansman's hood and the noose ... are intended to arouse fear.") (internal quotations and brackets omitted).

NAES argues that Brockman's hostile work environment claim is "refuted" by his deposition testimony that "the conduct about which he complains in this case did not keep him

---

[3] *See* William R. Black, *How Watermelons Became a Racist Trope*, THE ATLANTIC (Dec. 8, 2014), https://www.theatlantic.com/national/archive/2014/12/how-watermelons-became-a-racist-trope/383529/ [https://perma.cc/Y8SC-PM2B] (once a symbol of Black self-sufficiency, watermelons became a stereotype that Black people were not ready for freedom during the Jim Crow era); Gene Demby, *Where did that fried chicken stereotype come from?* NPR CODE SWITCH (May 22, 2013, 6:03 PM), https://www.npr.org/sections/codeswitch/2013/05/22/186087397/where-did-that-fried-chicken-stereotype-come-from [https://perma.cc/FR64-LD7A] (fried chicken stereotype emerged from D.W. Griffith's 1915 controversial silent film *Birth of a Nation* about the founding of the Ku Klux Klan).

from performing his job well." Doc. #76 at 26-27. But as the Second Circuit has recently ruled, "impact on job performance" is "relevant to finding a hostile work environment" yet "is by no means dispositive." *Rasmy*, 952 F.3d at 390.

NAES also argues for a "same actor" inference—that because O'Connor was involved with the initial decision to hire Brockman for his job, there should be no inference that O'Connor would engage in discriminatory misconduct against Brockman. *See, e.g., Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000). Whatever the general merit of a same-actor inference may be, a reasonable jury could conclude that any such inference should have very little weight here if it credits Brockman's claims about the racially charged comments made to him by O'Connor or concludes that O'Connor painted a swastika to intimidate Brockman.

It is one thing to invoke a same-actor inference where the evidence of any bias at all is indirect and purely circumstantial; it is another to invoke the same-actor inference where the evidence of bias is direct in the form of the actor's use of racial terms of reference. NAES has done nothing to show that the same-actor inference overcomes or negates consideration of explicitly discriminatory statements and actions. *See, e.g., Chukwueze v. NYCERS*, 643 F. App'x 64, 65 n.1 (2d Cir. 2016) (rejecting application of same-actor inference to support dismissal of religious discrimination claim where evidence showed that the actor "had expressed displeasure at plaintiff's requests for religious accommodations").

All in all, a genuine fact issue remains for Brockman's hostile work environment claim. The instances of alleged abusive comments and conduct as well as their racially tinged character are enough for a jury to credit Brockman's claim that he subjectively perceived the environment to be abusive because of his race and that the environment was objectively hostile and abusive on account of race. As the Second Circuit has explained in the context of a hostile work

environment claim, "the overall severity and pervasiveness of discriminatory conduct must be considered," and "[b]y its very nature that determination is bound to raise factual disputes that likely will not be proper for resolution at the summary judgment stage." *Rasmy*, 952 F.3d at 390. Moreover, because O'Connor was Brockman's supervisor, a jury could reasonably attribute the environment to NAES as the employer defendant. *See Kaytor*, 609 F.3d at 546. I will deny NAES's motion for summary judgment as to Brockman's hostile work environment claims.

### *Retaliation*

Brockman alleges that he was subject to unlawful retaliation—that NAES rescinded his transfer to a new position in retaliation for his complaint about O'Connor's harassment. The anti-discrimination laws protect employees not only from being subject to discrimination but also from retaliation for having lodged a complaint about discrimination. Courts apply the familiar *McDonnell-Douglas* three-part burden shifting framework when evaluating such retaliation claims whether under Title VII, § 1981, or CFEPA. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Littlejohn*, 795 F.3d at 315 (Title VII and § 1981); *Polk v. Sherwin-Williams Co.*, 2019 WL 1403395, at *4 (D. Conn. 2019) (CFEPA).

For the first and *prima facie* stage of the *McDonnell-Douglas* inquiry, Brockman must show: (1) that he engaged in protected activity to complain about or otherwise oppose discrimination; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between his activity and the adverse action. *See Rasmy*, 952 F.3d at 391. The record shows a genuine fact issue for all three of these requirements. First, Brockman's initial written complaint and later call to the hotline explicitly stated that he believed O'Connor was harassing him on the basis of race. *See* Docs. #83-7 at 2, #83-8 at 2.[4] Second, Brockman lost out

---

[4] Brockman need not show that the practices he opposed were actually unlawful. Rather, so long as a plaintiff has a good faith, reasonable belief that he was opposing an unlawful employment practice, he may not be subject to

11

on a new position as a loader operator; NAES does not dispute that this was an adverse action that is cognizable for purposes of a retaliation claim. Third, Brockman's job offer was rescinded in late April 2018, only about six or seven weeks after his protected complaints began in March 2018. This close temporal proximity is enough to support a *prima facie* claim of causation. *See Rasmy*, 952 F.3d at 391 & n.59 (five months not too long).

For the second stage of the *McDonnell-Douglas* inquiry, a court must consider whether the employer has articulated a legitimate, non-discriminatory basis for the adverse action. NAES has done so. It claims that Brockman was not qualified for the transfer because of the company policy that purportedly does not allow an employee to internally transfer unless the employee has worked for the company for more than a year.

For the third and final stage of the *McDonnell-Douglas* inquiry, Brockman must show that there is a genuine fact issue to support his retaliation claim notwithstanding the employer's explanation. He has met this final burden. To begin, a jury could well find that NAES's proffered explanation is highly suspect. The terms of its policy (as quoted above) do not categorically prohibit in-company transfers of employment within the first year of employment but at most discourage such transfers and leave it to the company's discretion. Doc. #83-5 at 2.

A jury could also find it rather odd that Brockman would be offered the new position in the first instance, only to have it taken away. Because the plain language of the transfer policy does not purport to make the one-year rule mandatory, a jury could conclude that the suggestion of a company official (O'Rourke) that it *was* mandatory suggests the transfer policy was used as a convenient pretext in Brockman's case. Doc. #83-9 at 11-12. In view of the temporal proximity

---

retaliation for making a complaint. *See, e.g., Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14-15 (2d Cir. 2013) (*per curiam*). There is at least a genuine fact issue whether Brockman had such a good faith and reasonable belief.

of Brockman's complaints and the unusual circumstances of rescission, a jury might well conclude that NAES reconsidered Brockman's transfer out of concern that he was a "squeaky wheel" who was pressing bothersome claims about discrimination. In short, a genuine fact issue supports Brockman's retaliation claim.

### *Constructive discharge*

"Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Gonzalez v. City of New York*, 2021 WL 438894, at *6 (2d Cir. 2021) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996)). As the Second Circuit has recently made clear, "a constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of her assignments or criticism of her work, or where the employee found the working conditions merely difficult or unpleasant." *Green v. Town of East Haven*, 952 F.3d 394, 404 (2d Cir. 2020) (internal quotations and citations omitted). Instead, Brockman must prove that NAES by intention created a race-based hostile work environment that was objectively intolerable such that any reasonable person in his situation would have felt compelled to resign his employment with the company. *Id.* at 405.

As is true for the hostile work environment claim upon which Brockman's constructive discharge claim is largely based, the constructive discharge inquiry is highly fact intensive. "If any relevant facts are in dispute or subject to competing inferences as to their effects, or if there is admissible evidence from which a rational juror could infer that a reasonable employee would have felt so compelled [to resign], rejection of the constructive-discharge theory as a matter of law is impermissible." *Ibid.*

Here, Brockman has presented sufficient evidence for a reasonable factfinder to find that he was constructively discharged. For substantially the same reasons discussed above concerning the hostile work environment claim, a reasonable factfinder could find that, under O'Connor's supervision, Brockman experienced a work environment that was deliberately hostile to him because of his race.

Moreover, the record shows steps by O'Connor that a jury could understand to be directed toward inducing Brockman to quit his job with NAES. O'Connor verbally threatened Brockman "that this is not going to go well for you" after Brockman sought advice from a shift supervisor about how to deal with O'Connor and then O'Connor allegedly painted a swastika after being told by management to apologize to Brockman. In addition, O'Connor allegedly told Brockman that taking sick leaves would be held against Brockman personally, that Brockman would be fired for checking his phone, and that Brockman should first submit a letter of resignation if he wanted to apply for transfer to another company position. *See Chertkova*, 92 F.3d at 89-90 (supervisor's comment that plaintiff "would not 'be around'" and threat that plaintiff "would be fired immediately if, over the course of two years, she did not maintain satisfactory performance levels" was evidence of constructive discharge).

In addition, to the extent that Brockman could reasonably have concluded that he was subject to retaliation when his job transfer was rescinded, this would be yet an additional objective reason that a jury might conclude that NAES created hostile work environment conditions that *de facto* compelled Brockman to leave his position. Of course, NAES vehemently disputes many of these predicate facts as well as the inferences to be drawn from them. It also points out that Brockman had little or no interaction with O'Connor in his last three months of employment and that Brockman found the job to be tolerable enough to give two-weeks notice of

his departure rather than leaving immediately. But when all the evidence is considered in its totality, there is enough here for a jury to decide in Brockman's favor on his claim of constructive discharge.

## CONCLUSION

For the reasons set forth above, the motion for summary judgment (Doc. #73) is DENIED. I have considered all other arguments raised by NAES even if these arguments have not been expressly addressed in this ruling. The parties shall file their joint trial memorandum by **April 15, 2021**, and the Court will thereafter schedule the case for trial.

It is so ordered.

Dated at New Haven this 8th day of March 2021.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge